**SOUTHLAND RESHIP, INC., Plaintiff,**

v.

**S. Leslie FLEGEL, Individually and d/b/a Periodical Sales of America, et al., Defendants.**

**No. C74-727A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Sept. 26, 1975.

5. *See* n.3 *supra.*

**340**

Charles H. Kirbo, Lanny B. Bridgers, King & Spaulding, Atlanta, Ga., Bob Burleson, Bowmer, Courtney, Burleson & Permberton, Temple, Tex., for plaintiff.

Terrence Lee Croft, Huie, Brown & Ide, Atlanta, Ga., Alan E. Popkin, Rosecan, Popkin & Chervitz, St. Louis, Mo., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOYE, District Judge.

*Findings of Fact*

1. This suit involves the sale and delivery of magazines, periodicals and paperback books in parts of the states of Georgia, Alabama, Kentucky, Tennessee, Mississippi and South Carolina.

2. Plaintiff, Southland Reship, Inc., is a Texas corporation which was formed by M. H. Elliott and began operations on October 1, 1974.

3. Southland commenced its operations by purchasing from Mid-Continent News Company, a subsidiary of ARA Services, Inc., the records, accounts receivable, equipment, inventory and goodwill of Mid-Continent's Rome, Georgia, Reship Division. Mid-Continent continued its own reship operations in other parts of the country.

4. Southland allocated $447,000.00 of the moneys paid Mid-Continent and ARA for an agreement from them to refrain from competing with Southland in the Rome, Georgia, reship territory for five years.

5. A Federal Trade Commission consent decree involving ARA and Mid-Continent had required Mid-Continent to divest itself of the Rome, Georgia, Reship Division. Southland's purchase and operation of what had formerly been Mid-Continent's Rome, Georgia, Reship Division was therefore with the approval, and perhaps, a sense, under the auspices, of the Federal Trade Commission.

6. The Rome, Georgia, Reship Division of Mid-Continent for many years, and Southland, prior to the matters giving rise to this litigation, each was the only wholesale distributor of paperback books, magazines and periodicals for rural retailers in Georgia, Alabama, Mississippi, Florida, North Carolina, South Carolina, Kentucky and Tennessee.

7. Defendant, S. Leslie Flegel, is a resident of the State of Mississippi and is the sole stockholder of defendants, Periodical Shippers of America, Inc., SLF News Distributors, Inc., and SLF Reship Corp., all of which are Missouri corporations with principal places of business in Missouri.

8. The defendant Don Hart is a resident of Oklahoma; defendant George

Neal is a resident of Kentucky; defendants Ronald Garrison, Stanley Johnston and Robert Blackwell are all residents of Georgia.

9. Periodical Shippers of America, Inc., supplied magazines, periodicals and paperback books to bookstores and distributors throughout the Southeast after its organization for that purpose in December, 1974. One of its customers was a chain of drug stores in South Carolina.

10. Defendant, Don Hart, was, at the time of the purchase by Southland of Mid-Continent's business in the Rome area, the manager of Reship at Mid-Continent. As such, he was responsible for Mid-Continent's operations in the Rome reship area. He was personally involved in the negotiations for the purchase by plaintiff of Mid-Continent's Rome Reship Division, and had responsibility for preparing Mid-Continent's dealer contracts, accounts receivable, inventory, and other records to be turned over to plaintiff.

11. Defendant George Neal had been a routeman for Mid-Continent in Kentucky where he was under the supervision of Don Hart.

12. Defendants Ronald Garrison and Stanley Johnston had been routemen for Mid-Continent in Georgia where they were under the supervision of Don Hart.

13. Defendants George Neal and Ronald Garrison were offered and accepted positions as supervisors for plaintiff. Defendants Stanley Johnston and Danny Myers, as well as James Brock and James Cheaves were offered, and accepted, positions as routemen for plaintiff.

14. When Southland acquired the Rome, Georgia, Reship Division from Mid-Continent, it solicited most of the Mid-Continent employees working in the Rome, Georgia, Reship Division to become its employees and promised them compensation and benefits equal to that which they had been receiving from Mid-Continent.

15. None of the Mid-Continent employees in the Rome, Georgia, Reship Division had "non-compete" contracts, or contracts of any kind, other than employment terminable at will; and the employees hired by plaintiff did not have "non-compete" contracts or written contracts of any kind, either, and their employment also was terminable at will either by Southland or by the employee.

16. Mid-Continent had contracts with its customers in the Rome, Georgia, Reship territory which stated that, "A written notice allowing ten days on magazines and 30 days on newspapers shall be given your office by me of cancellation of all or any part of this order before same shall be binding on you."

17. Don Hart, from his years as Reship Manager at Mid-Continent, knew the sales and financial facts about the Rome, Georgia, Reship Division; and Neal, Garrison and Johnson knew its customer list by heart.

18. Hart and King knew the salaries of all Mid-Continent employees in the Rome, Georgia, Reship Division and knew the sales and financial details relating to the performance of that Division prior to the time Mid-Continent sold that Division to plaintiff. Mid-Continent did not have records of the performance of that division after its sale to plaintiff.

19. Defendants Flegel and Hart, who were acquainted with each other, had discussed, in the Fall of 1974, in addition to the possible employment of Hart in one of Flegel's operations, the fact that there were quite a few employees at Mid-Continent who were unhappy in their jobs at Mid-Continent.

20. About January 15, 1975, Hart was relieved as manager of Reship at Mid-Continent, and immediately telephoned Flegel to discuss possible alternative employment. Other telephone conversations followed, and a meeting between the two in St. Louis was arranged.

21. Flegel and Hart met in St. Louis during the latter part of January, 1975

(around January 20 according to Flegel —January 27 according to Hart). Hart had with him Mid-Continent's income statement relating to the Rome Reship operation, which statement had been in his possession as Manager of Reship for Mid-Continent. Also present at that meeting were Alan Poplin, Flegel's attorney, and Fred Steinback, Flegel's marketing man. During that meeting, Hart and Flegel agreed that Hart would come to work for Flegel in a reship operation, and the two also discussed other employees of Southland and Mid-Continent who might likewise be interested in coming to work for such an operation. George Neal, one of Southland's two supervisors, was one of the employees so discussed.

22. Thereafter, Hart met with Billy King, a Mid-Continent employee, and discussed his joining Hart in the new venture, as well as other employees of Southland and Mid-Continent. Hart told King that he, Hart, had already discussed the matter with defendant George Neal and indicated that Neal would be leaving Southland to join the new venture, as would Danny Myers, one of Southland's routemen in Kentucky. Hart also told King that defendant Garrison, the other Southland supervisor, and two of Southland's routemen in Rome were also committed to the new operation.

23. While the original plans which Hart discussed with Flegel and the other Mid-Continent and Southland employees, contemplated the formation of a new corporation for the proposed reship operation, such new corporation was, in fact, never formed. Instead, until the time of trial, the said reship operations were conducted by the participants under the name "Periodical Sales of America." The relationship between Periodical Sales of America and Periodical Shippers of America, Inc., is unclear from the record.

24. Hart was in charge of planning the operations of the new reship operations, and discussed those plans with King. The proposed salaries for the employees of the new venture were discussed by Hart and King, who initially was committed to the new venture, and, in each case the proposed salary was higher than the employee's then salary at Mid-Continent, or Southland, as the case might be. Hart and King, of course, knew what salaries the employees were presently receiving at Mid-Continent. Hart told King he knew what salaries the Southland employees were receiving, but the source of that information does not appear in the record. A proposed bonus system of compensation was discussed, but whether the bonus would be paid on total customers acquired, or number of customers switched from Mid-Continent or Southland is unclear.

25. The initial capital for the new venture in the amount of $300,000 was to be supplied by Flegel.

26. Hart and King, in planning the proposed operations, projected that they could obtain over $5,000,000 in sales and that 60 percent of Southland's customers could be switched to the new venture within 90 days. The record is unclear as to the projected penetration of the Mid-Continent market areas.

27. Flegal and Hart scheduled a meeting in St. Louis to be attended by Mid-Continent and Southland supervisors and routemen who wished to join the new enterprise. The plan was for supervisors to meet on February 7, 1975, and for the routemen to join the meeting on the 8th. However, when Hart learned that Mid-Continent had scheduled an employees' meeting for the 7th (as had plaintiff), Hart and Flegel advanced the commencement of their meeting to the 5th so that they could talk to Southland's and Mid-Continent's employees beforehand.

28. Plaintiff, through its vice-president in charge of sales, B. Hunka, announced that any routemen who attended defendants' meeting in St. Louis was automatically fired. James Brock was a Southland routeman who attended that meeting, and thus was automatically fired. He still gave notice of his resig-

nation and joined defendant Periodical Sales of America.

29. Plaintiff's officers, M. H. Elliott and B. Hunka were made aware of the proposed St. Louis meeting by their supervisors, Neal and Garrison. They did not voice any objection to Neal's and Garrison's attending the meeting, but asked them to report back to Southland what were the plans made at that meeting.

30. Defendant Hart, the moving force behind Periodical Sales of America, never worked for plaintiff. He was manager of Reship for Mid-Continent until the middle of January, when his employment was terminated there, or he was demoted, following a heart attack. It was in response to that situation that he contacted defendant Flegel concerning possible employment, and although it was originally understood between them that Hart would take over management of defendant Flegel's existing Tulsa operation, subsequently the plan for the new organization ultimately known as Periodical Sales of America was worked out.

31. Seven employees, including plaintiff's only two full-time supervisors, left plaintiff to join defendant, Periodical Sales of America. At that time plaintiff had 70 to 80 employees. Other employees joining Periodical Sales of America came from Mid-Continent.

32. It was contemplated, generally, that each employee, supervisor or routeman, would perform for Periodical Sales of America, the same duties in the same territory as he had performed for his previous employer, Southland or Mid-Continent.

33. Plaintiff had the opportunity, within a week after the new organization commenced operations, to rehire its two supervisors, defendants Garrison and Neal, and refused to do so because, according to plaintiff's vice-president, Hunka, it did not wish to employ anyone of questionable loyalty.

34. James Cheaves, one of plaintiff's routemen located in Alabama, had already been employed by Flegel, in connection with Flegel's existing operators, in mid-January, 1975, prior to the Flegel-Hart discussions which resulted in the creation of Periodical Sales of America. It had been agreed then between the two that Cheaves would ultimately work for Flegel in Alabama, but was to work in Missouri for the time being.

35. The Southland employees who attended the St. Louis meeting and joined Periodical Sales of America signed written resignations and mailed them to Southland in one envelope, in addition to telephone notice.

36. The plaintiff's former employees, who had switched employment to defendant, Periodical Sales of America, began Monday, February 10, 1975, actively to solicit plaintiff's customers on the routes and in the capacities which had been theirs when in plaintiff's employ.

37. Defendant, Periodical Sales of America, offered plaintiff's customers better service (truck v. mail) and rates than they had received from plaintiff. There was testimony from plaintiff's employees that it had been on the verge of inaugurating the identical improvements offered by Periodical Sales, and the record shows that it immediately did so. As to rates, plaintiff merely "met" the competitive rates of Periodical Shippers when convinced the latter was offering a lower rate to a worthwhile customer. The testimony of plaintiff's vice-president Hunka was to the effect that investigation conducted by plaintiff as to why some of its customers had switched to Periodical Sales showed that friendship with the routemen, better rates and service were the predominant causes.

38. No former employee of plaintiff has been employed by defendant, Periodical Sales, in Mississippi.

39. The critical reason for the switch of employment by plaintiff's supervisors and routemen to defendant, Periodical Sales of America, was their discontent with their remuneration, which was less

than they had anticipated. Such discontent was also the reason for the transfer of employment by Mid-Continent employees joining Periodical Sales of America.

40. The only Southland customers to testify, Wright, Harris, Smith and Scoggins, testified that no defendants seriously disparaged plaintiff or urged misuse or harm of plaintiff's property or gave any directions detrimental to plaintiff or gave any false or untrue statements about plaintiff.

41. The actual effect of defendants' operations has been pro-competitive. Prices to retailers have been reduced; service admittedly has improved, although plaintiff denies that the improvement in its own service was due to the defendants' competition. While defendants clearly have taken some of plaintiff's customers, there is no evidence that the overall business of both companies is not equally as large as, if not larger than, the prior business of plaintiff alone.

*Conclusions of Law*

1. The Court has jurisdiction over the subject matter of this action under the provisions of sections 4 and 16 of the Clayton Act and 28 U.S.C. § 1337, and pendent jurisdiction over the state law claims. While plaintiff asserts that the Court also has diversity jurisdiction over the state law claims (28 U.S.C. § 1332), this position is doubtful as a factual matter in view of the substantial extent of plaintiff's operations in Georgia, but in view of the Court's acceptance of pendent jurisdiction (the same factual situation gives rise both to plaintiff's antitrust claims and its state law claims), there is no need to decide whether in fact the Court does also have diversity jurisdiction.

2. This is principally a Sherman Act § 1 (15 U.S.C. § 1) case. Plaintiff relies primarily on a line of four decisions exemplified by *Perryton Wholesale, Inc. v. Pioneer Distributing Co.*, 353 F.2d 618 (10th Cir. 1965), *cert. denied,* 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208. In that case, both plaintiff and defendant were "rack jobbers." They supplied and serviced retail dealers with non-grocery products through salesmen who solicited new accounts, took orders from existing customers, stocked their "racks," assisted in displaying the merchandise, and picked up for credit items which had not been sold in a reasonable time. As the sole personal contact with customers, the route salesmen were crucial to plaintiff's success.

Within a short time after entering the rack jobbing business, Perryton persuaded a number of plaintiff's key employees, supervisors and route salesmen to transfer employment to Perryton, concomitantly bringing with them virtually all of their accounts. Plaintiff brought a Sherman Act Section 1 case, and the District Court entered an injunction and awarded treble damages to plaintiff. Defendant appealed and the Court of Appeals for the 10th Circuit affirmed. The Supreme Court denied certiorari. The rule of law applied by the Court of Appeals was stated as follows:

"The statute [Sherman Act § 1] applies when there is a conspiracy to impose an unreasonable restraint on interstate trade and commerce. This occurs when a conspiracy exists to suppress competition in interstate trade through the elimination of a competitor by unfair means."

There is great factual similarity between *Perryton* and the case at bar. There are also some differences, the most important of which is that here the impetus for the transfer of loyalty was the dissatisfaction with current working conditions which led to a simultaneous departure of several employees both of plaintiff and Mid-Continent who decided to band together to form a new company when assured of adequate financial support, whereas, in *Perryton* there was, from what appears in a rather terse opinion, a conscious pirating by an existing, operating company of a competitor's key employees.

In view of the importance of *Perryton* to a correct decision in this case, further analysis of *Perryton* is important.

Perryton was actually the third case in the line of cases supporting the legal principle set forth above. It followed, and relied upon *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.*, 57 F.2d 96, 102 (1st Cir.), *cert. den.*, 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932), the lead case, and *Atlantic Heel Co. v. Allied Heel Co.*, 284 F.2d 879, 884 (1st Cir. 1960). The fourth was *C. Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F. Supp. 501 (E.D.Pa.1973).

The first circuit was again faced with a request to declare the conjunction of unfair competitive practices with ability to harm a competitor seriously a per se antitrust violation in *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.*, 508 F.2d 547 (1st Cir. 1974). It declined to do so, and its reasoning is highly instructive. That Court said (508 F.2d 560–61):

"We are also concerned over the implications of what has been termed 'judicial crime making'. [Turning unfair competitive practices into per se antitrust violations.] Were we to declare the conduct and intent arguably evidenced in this case a per se violation of section 1, we would confront initially the problem of formulating a neutral definition. If we said that the range of practices engaged in here amounted to such a violation, this would be an ad hoc judgment, carrying little precedential value but spawning future efforts in similar but somewhat varied circumstances to pin the same label. Even if we were to identify one or several particular practices, we would be elevating to a federal crime what has previously been attacked on the basis of state law or civil penalty. In so doing, we would run the risk of overbreadth, encompassing conduct which fosters competition; of weakening, through making available sanctions which may in practice be avoided, the deterrent effect of the antitrust laws; of subjecting defendants to captious resort to treble damage suits, with evaluation of subjective intent being the chief determinant, and varying from jury to jury. Moreover, extending a per se classification to the kinds of competitive torts confronted here would go far to yielding to a long resisted temptation to create a federal common law of unfair competition.

\* \* \* \* \* \*

"Thus if the instant case is of the genre of this family of four [Pick-Barth, Atlantic Heel, Perryton, C. Albert Sauter Co.] we [the First Circuit] are the chief authority for appellant's contention that Paddock's actions and motivation constitute a per se violation, without considering any impact on competition. We acknowledge, forty-two and fourteen years later, that we have some doubt about our pronouncements. It is, first of all, clear that we have only two lineal descendants in all these years and we cannot believe that sharp practice has been so rare. More substantively, we share the doubts of Judge Frankel in *Vogue Instruments, supra* [*Vogue Instrument Corp. v. Lem Instruments Corp.*, 40 F.R.D. 497, 499 (S.D.N.Y. 1966)], that this kind of conduct does not feel to lawyers like the stuff of antitrust. We have in mind also the criticism voiced not only of the conspiracy analysis in *Pick-Barth* and *Atlantic Heel*, not relevant here, but our failure to define with any precision the practices held to be a per se violation. \* \* \* More generally, we are impressed by reflecting on the carefully selected considerations which have gone into the declaring of a few practices as per se violations, the danger of casual extension of the category, the value of prior case experience, the availability of the law of torts to deal with such issues as interference with contractual relations and interference with prospective ad-

vantages, not to forget the availability of the Federal Trade Commission Act . \* \* \*

"Insofar as *Pick-Barth* and *Atlantic Heel* may be said to stand for the broad proposition that unfair competitive practices accompanied by an intent to hurt a competitor constitute per se violations of the antitrust laws, we do not now accept their teaching. We do not feel it necessary to criticize their results on the fact situations there presented—an effort by a defendant which was a significant factor in the market to eliminate a competitor. These were instances, as were *Perryton* and *Sauter*, of a sharply focused effort to drain off from a plaintiff its key personnel, confidential information, customer lists, and reputation. In the instant case the focus is not on crippling the organization of a competitor but on beating it in the market place. Perhaps the difference is only that between going to the jugular and going to one of the lesser arteries. But the difference, we feel, is enough."

Here, the focus of defendants was on creating a viable, competitive reship organization which would provide the desired remuneration for its employees, some of which were plaintiff's former employees. While defendants' program involved taking customers away from plaintiff, there is nothing illegal in that —such is the intent of the antitrust laws which favor vigorous competition.

■ Thus, it is elementary that the antitrust laws, and particularly Section 1 of the Sherman Act, are focused sharply upon forbidding anti-competitive conduct. The conduct under consideration in *Perryton* was extremely vigorous competition—too much so, in fact. When can the antitrust acts be held to prevent vigorous competition? *Pick-Barth, Atlantic Heel, Perryton* and *Sauter* can be applied, consistent with accepted antitrust principles, only in a unique situation—when the result is to eliminate the effective competitor, and thereby reduce the quantum of existing competition.

But so far as competition is concerned, it makes no difference whether Company A or Company B renders the service involved if there is only one company in the field. If a completely new, previously non-operating company, entirely supplants an existing company, there has been no injury to competition if the quantum of service rendered by the new company equals that of the old. And, as set forth in the Court's Findings of Fact, there is no evidence of record in this case that there has been any diminution in the total quantum or quality of reship service in the plaintiff's market ever since defendants began their operations. Instead, just the contrary is true.

■ In short, the evidence in this case will not support either of the two predicates necessary to set the *Perryton* principles in operation—(1) a significant existing competitor on the one hand seeking (2) to completely eliminate the complaining plaintiff on the other.

In the first place, it is clear that the Periodical Sales organization was a completely new one beginning operation only with the activities herein complained of. Defendant Flegel's other operations. although they may have competed peripherally with plaintiff, nevertheless, so far as the record here shows, had no substantial involvement in the matters under investigation. Secondly, although there was some braggadocio by one of the defendants, the evidence does not show that defendants had any purpose[1] or ap-

---

[1]. The employment of so-called "dirty tricks" may be evidence of an attempt to exclude, and, in a situation where it is clear that only one competitor may survive, this factor may be crucial. Thus, Judge Wyzansky has stated (*Union Leader Corp. v. Newspapers of New England, Inc.*, 180 F.Supp. 125, 140 (D.Mass.1959), *aff'd in part and rev'd in part*, 284 F.2d 582 (1st Cir. 1960), *cert. den.*, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744 (1961) :

". . . we may say that there is no sharp distinction between (a) the existence of an intent to exclude and (b) the use of unfair

parent ability to eliminate plaintiff as a competitor. The *Perryton* principle requires an effort to knock out a competitor as an entity, to render it incapable of competition. Merely taking over one or more, less than substantially all, of its territories or customers is insufficient. There must be the thrust at the jugular as the First Circuit has found. Here, the new company, starting off with seven of plaintiff's 80 employees, fewer than that of the many more employees of Mid-Continent, took on both those established companies as competitors. The Court cannot find that the defendants contemplated, even optimistically, rendering the coup-de-grace to both plaintiff and Mid-Continent—yet that is the necessary thrust of this lawsuit. The defendants simply did not have enough employees to go around to dream of such a result. And the factual situation here shows plaintiff was not even concerned enough to want to hire back its two supervisors, by whose efforts it claims to have been so severely harmed, and its financial and operating results show that, while plaintiff has lost some business, it is far from being mortally hurt. It is difficult to see how the antitrust laws could rationally be enforced if both too little and too much competition were anathema, and only a precisely defined middle ground acceptable. Rather the philosophy of the antitrust laws has been to promote the most vigorous competition possible, leaving any excesses to the band and sanction of other laws or penalties. Thus, this Court feels with the presently-constituted First Circuit that the line of cases of which *Pick-Barth* was the progenitor constitutes an aberration in the field of antitrust law, and should not be followed, and this Court declines to do so.

 3. Alternatively, assuming *Perryton* to be representative of the law in this Circuit, nevertheless, under the facts of this case, the principle there announced is not applicable. In addition to the presently-constituted First Circuit of Appeals, other courts have had difficulty accepting *Perryton's* holding as representing a correct statement of the law. See: *Tower Tire and Auto Center, Inc., v. Atlantic Richfield Co., et al.,* 392 F.Supp. 1098 (D.C.Tex.1975); *duPont Walston, Inc. v. E. F. Hutton & Co., Inc.,* 368 F.Supp. 306 (S.D.Fla. 1973); *Frederick Chusid & Co. v. Marshall Leeman & Co.,* 326 F.Supp. 1043 (S.D.N.Y.1971). Each of those cases has distinguished *Perryton* from the cases under consideration principally on a failure of the evidence to show a conspiracy with the purpose or effect or both of completely eliminating a competitor. As pointed out above, the First Circuit has held, additionally, that one of the competitors must be "a significant factor in the market." *George R. Whitten, Jr., Inc., supra,* 508 F.2d 562. And it is only if those requirements are emphasized that the *Perryton* formula makes any sense antitrustwise.

The Court finds that the evidence will not sustain the proposition that defendants were a significant competitor in the market or that they sought, or had the ability to cause, any near-fatal injury to plaintiff's ability to compete in the reship business. Rather the record indicates that defendants were seeking to build their own business, and provide competition in an area in which there previously had been no competition, a situation which had permitted working conditions at plaintiff to deteriorate to the point where some of the defendants were willing to take the rather heavy risks which always accompany the establishment of a new enterprise in order to improve their working conditions.

means. In a situation where it is inevitable that only one competitor can survive, the evidence which shows the use, or contemplated use, of unfair means is the very same evidence which shows the existence of an exclusionary intent. . . . "

This may be the real, unarticulated basis for *Perryton*, et al., but the quotation above demonstrates the importance of the factor of defendants' practical ability to take over completely. Such evidence is not present in this case.

**348**

The matters set forth in this paragraph also dispose, adversely to plaintiff, of plaintiff's claims that defendants' behavior constituted an attempt to monopolize.

4. Since plaintiff's state law claims for tortious interference with contractual (employment) relations ("pirating" of key employees), depends upon the same operative facts as its antitrust claim, the Court accepts pendent jurisdiction of them, thus obviating the necessity of considering whether the Court has diversity jurisdiction, as to which there is considerable doubt in the Court's mind. However, the Court finds that the evidence will not support those claims of plaintiff.

So far as the plaintiff's state law claims relate to interference with employment relations, the discussion in the preceding paragraph is dispositive. The Court has found and does conclude that the switch in employment by seven of plaintiff's employees occurred not because of any pirating or inducement from an outside source, but because they were dissatisfied with their existing employment conditions—remuneration particularly—and wished to join similarly dissatisfied employees of Mid-Continent to start a new company to improve their own working conditions.

Similarly, the Court finds and concludes that the representations by defendants to plaintiff's former customers did not amount to such malicious disparagement as to constitute "slander of title" or "trade libel," but rather that, following the defection of defendants from plaintiff's employment some defendants, and some of plaintiff's employees, sought to suggest to customers, without actual misstatement, inferences unfavorable to their competition. The Court does not feel these exceeded the bounds of vigorous competition.

5. For the reasons set forth above, the Court concludes that plaintiff is entitled to recover nothing as against defendants.

6. Likewise, defendants are entitled to recover nothing as against plaintiff on defendants' counterclaim. With respect to defendants' claims of unfair trade practices on the part of plaintiff, the discussion hereinabove is dispositive. As to defendants' claim of monopoly as against plaintiff, the evidence does not show any injury to defendants in their persons or property by reason thereof if indeed plaintiff constituted a monopoly prior to the matters herein discussed.

7. The restraining order heretofore issued is hereby dissolved.

8. Pursuant to previous action by the Court, this constitutes the Court's final order in this matter.

So ordered.