SOUTHLAND RESHIP, INC.,
Plaintiff-Appellant,

v.

S. Leslie FLEGEL, Individually and d/b/a Periodical Sales of America, et al.,
Defendants-Appellees.

No. 75–3770.

United States Court of Appeals,
Fifth Circuit.

July 2, 1976.

Rehearing and Rehearing En Banc
Denied Sept. 17, 1976.

Charles H. Kirbo, Lanny B. Bridgers, John Izard, Atlanta, Ga., Bob Burleson, Temple, Tex., for plaintiff-appellant.

Alan E. Popkin, St. Louis, Mo., for defendants-appellees.

Before TUTTLE, AINSWORTH and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal by Southland Reship, Inc. from the denial on the merits by the district court of a permanent injunction sought by Southland both on Sherman Act and on Georgia state law claims. Southland also appeals from the district court's consolidation, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, of its motions for a preliminary and permanent injunction, arguing that it was thereby deprived of its right to a jury trial on liability.

Southland Reship, Inc. is a company that provides distribution and associated services of books, magazines, periodicals and newspapers to retailers. A Texas corporation organized in 1974, Southland purchased the Rome, Georgia Reship Division of another reshipper, Mid-Continent News Co., a subsidiary of ARA Services, Inc., on Sept. 27, 1974. This transaction resulted from an FTC consent decree involving ARA and Mid-Continent and requiring Mid-Continent to divest itself of the Rome Division. Until the entry of Periodical Sales of America into the market, the company owning the Rome Division (first Mid-Continent and then Southland) was the only wholesale distributor for rural retailers in Georgia, Alabama, Mississippi, Florida, North and South Carolina, Kentucky and Tennessee. Thus, they had a virtual eight-state monopoly.

Periodical Sales of America was organized in January and February of 1975, as a reshipper in the Southeast by S. Leslie Flegel. Flegel and several other corporations which he controls and which are involved in reshipping are among the appellees; only one of these corporations, Periodical Shippers of America, Inc., a Missouri corporation organized in December 1974, operates in the Southeast. The district court found that the relationship between Periodical Shippers and Periodical Sales was unclear from the record.

Another appellee, Don Hart, was manager of Reship at Mid-Continent at the time of the purchase by Southland and was personally responsible for preparing the Mid-Continent contracts, accounts receivable, and other records that were turned over to Southland. Furthermore, in the course of his employment he had committed to memory the financial details, including employees' salaries, relating to the Rome Division. In the Fall of 1974, Flegel and Hart, who were acquaintances, had discussed Hart's possible employment by Flegel in one of his reship operations. On January 15, 1975, subsequent to suffering a heart attack, Hart was relieved as manager of Reship at Mid-Continent; he immediately phoned Flegel to discuss employment. Flegel and Hart met in St. Louis, Mo., toward the end of January; they agreed that Hart would come to work for Flegel, and they discussed other employees of both Southland and Mid-Continent whom they thought might be interested in employment by Flegel. Although they contemplated forming a new corporation, they did not in fact do so; they simply conducted business in the Rome Division area under the name of Periodical Sales of America.

In setting up Periodical Sales, Flegel and Hart planned a meeting in St. Louis to be attended by Mid-Continent and Southland supervisors and routemen. This meeting was originally scheduled for Feb. 7–8, 1975; since both Mid-Continent and Southland scheduled employees' meetings for Feb. 7, the meeting was moved up and commenced on Feb. 5. None of appellant's employees was under contract, and when appellant heard of the St. Louis meeting it announced that any routeman attending would be fired. One routeman, James Brock, did attend. Upon deciding to accept employment with Flegel and Hart, he gave notice to Southland.

At least two of appellant's officers were aware of the meeting and of the fact that two of their supervisors, George Neal and Ron Garrison, had been invited. They did not object to their attending but instead asked them to report back to Southland on the content of the meeting. Both Neal and Garrison went to the meeting and both resigned from Southland and accepted employment with Periodical Sales. Within a week, however, appellant had an opportunity to rehire Neal and Garrison; it declined to do so because of their "questionable loyalty." The district court found that Neal and Garrison knew the Southland customer list by heart.

Both Garrison and Neal testified that they were told to hire routemen in order to fulfill their responsibilities as supervisors for Periodical Sales, but that they were not told to offer employment to appellant's routemen. Both did, however, solicit each routeman who had been working under them for appellant. Six routemen in all were approached subsequent to the meeting. [This excludes Brock, who was told of the meeting by Neal and who attended and decided to leave appellant's employ while in St. Louis.] Of these six, three left Southland and went with Periodical Sales (Johnston, Blackwell, and Myers); of these three, one, Blackwell, had been with Southland only one week.

Additionally, one other routeman, James Cheaves, had terminated his employment with appellant due to his general dissatisfaction in mid-January, prior to the creation of Periodical Sales. Cheaves' brother-in-law was employed by Flegel and through him Cheaves sought and obtained a position with Flegel. Thus, a total of two supervisors and five routemen left Southland and commenced work for Periodical Sales. Three of Southland's other routemen were

solicited by Periodical Sales but remained with Southland. Only the Southland supervisor in Mississippi, Sam Celino, and the routeman who worked for him, were not solicited. (It appears from Celino's deposition that more than one routeman may have worked under him, but since this is not clear we will assume there was only one since this is the position taken by appellant and most favorable to it.) Sam Celino was a recently-hired employee.

The testimony showed that George Neal had contacted Don Hart, prior to Hart's beginning negotiations with Flegel, about the possibility of a job with ARA. Ronnie Garrison testified that at the time he was told of the St. Louis meeting he was planning to seek other employment, but had not gotten around to it. Don Hart testified that at the time of his heart attack he had been approached by many of the employees who had formerly worked for him when Mid-Continent owned the Rome Division, and that several had expressed discontent with Southland. The largest single cause of employee dissatisfaction seemed to be salary cuts and decreased benefits put into effect by Southland.

The employees who left Southland and accepted employment with Periodical Sales gave notice between Feb, 6 and 9, and began work for Periodical Sales on Feb. 10. Southland countered this move by importing routemen and supervisors from other areas of their operation, and by hiring new routemen. Routemen can be trained in a very short time, apparently not longer than two weeks, and Southland had in the past trained routemen in as little as one week. Additionally, Southland had purchased Mid-Continent's contracts with the dealers, and they provided as follows:

"A written notice allowing ten days on magazines and 30 days on newspapers shall be given your office by me of cancellation of all or any part of this order before same shall be binding on you."

Thus, Southland had some time in which to reach its dealers and attempt to retain them as customers before their accounts could be terminated. It is clear, however, that the routeman is a reshipper's major contact with the dealer, and thus the relationship between the routeman and the dealer is extremely valuable to the company. This effect was somewhat diminished as far as the Southland routemen were concerned since they did not deliver and arrange the product for the dealer; rather, the periodicals were mailed. Periodical Sales offered the dealers truck delivery service and better rates; both of these factors apparently affected those dealers who switched to Periodical Sales, in addition to their friendship with the routeman. Since encountering competition by Periodical Sales, Southland has instituted truck deliveries and admittedly otherwise improved its services. Additionally, Southland met Periodical Sales price competition in many, but not all, cases.

The district court made extensive findings of fact. Among them were the following:

39. The critical reason for the switch of employment by plaintiff's supervisors and routemen to defendant, Periodical Sales of America, was their discontent with their remuneration, which was less than they had anticipated.

. . . . .

40. The only Southland customers to testify . . . testified that no defendants seriously disparaged plaintiff or urged misuse or harm of plaintiff's property or gave any directions detrimental to plaintiff or gave any false or untrue statements about plaintiff.

41. The actual effect of defendants' operations has been pro-competitive. Prices to retailers have been reduced; service admittedly has improved, although plaintiff denies that the improvement in its own service was due to the defendants' competition. While defendants clearly have taken some of plaintiff's customers, *there is no evidence that the overall business of both companies is not equally as large as,*

*if not larger than, the prior business of plaintiff alone.* (Emphasis added.)

In arguing its claim under Section 1 of the Sherman Act, appellant Southland relies on *Perryton Wholesale, Inc. v. Pioneer Distrib. Co.,* 353 F.2d 618 (10th Cir. 1965), cert. denied, 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208 (1966). Because we agree with the district court that appellant cannot prevail even under *Perryton,* we need not and do not decide whether the *Perryton* rule should be adopted in this Circuit.

■ The court in *Perryton* held that:

"The statute [Sherman Act § 1] applies when there is a conspiracy to impose an unreasonable restraint on interstate trade and commerce. This occurs when a conspiracy exists to suppress competition in interstate trade through the elimination of a competitor by unfair means."

*Id.* at 621. In this case, the district court found that there was no intent to eliminate the appellant. Both parties seem to concede that the clearly erroneous standard is to be applied to our review of the finding. Reviewing it by that standard, we find no error.

As for appellant's Section 2 claim, as appellant itself notes in its brief:

"The elements of a Section 2 attempt to monopolize claim as stated by this Court are (1) employment of 'unfair' methods, means and practices; (2) a 'specific intent' to monopolize some part of interstate trade or commerce; and (3) a 'dangerous probability' that such monopolization will be achieved. *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 207 (5th Cir. 1969). . . ."

Having found that the evidence did not show that the appellee had any "purpose or apparent ability to eliminate plaintiff as a competitor," the district court also found that no attempt to monopolize was shown. Again, we cannot find the district court's determination clearly erroneous.

■ Further, the district court ruled that appellant had failed to prove its state law claims over which the court had pendent jurisdiction. As to the allegation that appellee "pirated" appellant's employees, the court found that "the switch in employment . . . occurred not because of any pirating or inducement from an outside source, but because they were dissatisfied . . . ." The court found that there was no "trade libel" because all that occurred was that "some defendants . . . sought to suggest to customers, without actual misstatement, inferences unfavorable to their competition." This, the court ruled, did not exceed "the bounds of vigorous competition." Having already found that the details of appellant's operation were known to several appellees, the court did not remark in its conclusions of law on appellant's claim that its trade secrets were so used by appellees as to violate Georgia law. In affirming the district court's verdict in favor of appellee on all of appellant's state law claims, we note that appellant's president stated in his deposition not only that to his knowledge no trade secrets had been taken but that Southland *had no secrets.* Further, under Georgia law, "nonspecialized customer lists and other general confidential business and customer information" are not protected "from post-employment disclosure and use in the absence of contract." *Durham v. Stand-By Labor,* 230 Ga. 558, 563, 198 S.E.2d 145, 149 (1973).

■ Finally, appellant argues that it was unconstitutionally denied its right to a jury trial. In the district court, the appellees made a timely motion for a jury trial, pursuant to Rule 38, Fed.Rules of Civ.Proc. Since they did not specify issues, they are "deemed to have demanded trial by jury for all the issues so triable." Rule 38(c). The appellant was, of course, entitled to rely on this demand. Furthermore, Rule 39(a) provides that:

"The trial of all issues so demanded shall be by jury, unless . . . the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury."

And as the Supreme Court explained in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), where determination of the equitable issues would be conclusive as to the legal issues, the legal issues must be tried first in order to prevent abrogation of the right to a jury trial. Thus, in the absence of a waiver, the proper procedure would be for the district court to hold a hearing on the preliminary injunction, then to try the legal issues before a jury, and then to hold the hearing itself on the permanent injunction.

In this case, the court on April 18, 1975, consolidated the hearings on the preliminary and permanent injunction and set the hearing for May 19, 1975. This was done pursuant to Rule 65(a)(2), which specifically provides that it shall "be so construed and applied as to save to the parties any rights they may have to trial by jury." The matter actually proceeded to hearing on May 23; as the hearing began, the following colloquy occurred between the court and appellees' counsel:

"THE COURT: Let me interrupt now and make sure that we are clear with respect to the posture of the case. We are now in a final hearing on the merits which has been consolidated with the hearing on the Preliminary Injunction; is that correct?

MR. POPKIN: Well, Your Honor, as I understood it in any event, the final hearing was on the injunctive portion of the case; that the preliminary and final hearing on the merits of the injunctive hearing was being heard.

THE COURT: They have been consolidated and I simply want to make sure that that was the understanding of everybody.

MR. POPKIN: As pertains to whatever damage claims might or might not lie, as I understood it in any event, we had requested a jury trial on that if, indeed, we ever reach that point.

THE COURT: All right.

MR. KIRBO: [Appellant's Counsel]: Is that your understanding?

THE COURT: That's satisfactory to me. I sure can't cut off a man's right to a jury trial by Rule 65 consolidation. At least I don't think I can."

The hearing was concluded on May 28. The court requested findings of fact and conclusions of law from each party; they were filed. On Sept. 26, the court handed down its final order. Appellant did not object to the nature of the consolidated proceedings at any point throughout this time; only after the order went against them did they raise this issue. Appellant's position is that since they did not make a formal oral stipulation on the record consenting to trial without a jury, they are entitled to one on all issues so triable, including liability. On the facts of this case, we cannot agree.

■ In the first place, over a month elapsed between the time the district court consolidated the hearings and the hearing commenced; this was ample time for counsel to determine the effect of such consolidation and to object. Secondly, the court raised this precise issue at the beginning of the hearing, and appellees' counsel quite clearly waived their right to a jury trial on liability while retaining their right to a jury on damages; no other meaning can possibly be ascribed to his statements. And we particularly note that not only was appellant's counsel present for this colloquy, he participated in it by his query at the end. We find the record clear that he understood that liability was being presented to the court. Finally, after the hearing the court requested findings of fact and conclusions of law, and again without objection, appellant submitted them. These findings, of course, relate to liability issues. This course of conduct represents all too clear an acquiescence in the trial of liability to the court without a jury. Under these circumstances, we find that appellant cannot now complain that he was denied a jury because he did, in fact, waive one. The courts of other circuits have reached like conclusions. *National Fam. Ins. Co. v. Exchange Nat. Bank*, 474 F.2d 237 (7th Cir. 1973), *cert. denied*, 414 U.S. 825, 94 S.Ct. 129, 38

L.Ed.2d 59 (1973); *Smith v. Cushman Motor Works, Inc.,* 178 F.2d 953 (8th Cir. 1950). *See also Chapman v. Kleindienst,* 507 F.2d 1246 (7th Cir. 1974) (Failure to object normally constitutes a waiver, but not in a *pro se* case); *Olsen v. International Supply Co.,* 22 F.R.D. 221 (D.Ala.1958) (Failure to appear at trial is a waiver).

Indeed, this Circuit has announced the principle, albeit in *dictum* :

".  .  . in a civil case a waiver [of right to jury after demand] is shown by mere acquiescence, when the party or his counsel is present and not objecting."

*Bass v. Hoagland,* 172 F.2d 205 (5th Cir. 1949), *cert. denied,* 338 U.S. 816, 70 S.Ct. 57, 94 L.Ed. 494 (1949). We find that this is an appropriate case in which to apply this principle.

The judgment of the trial court is AFFIRMED.