**REDWING CARRIERS, INC., a Florida Corporation, Plaintiff,**

**v.**

**McKENZIE TANK LINES, INC., a Florida Corporation, et al., Defendants.**

**PCA No. 76–135.**

United States District Court,
N. D. Florida,
Pensacola Division.

Dec. 13, 1977.

D. L. Middlebrooks, S. Jack Carrouth, David A. Reed, Levin, Warfield, Middlebrooks, Graff, Mabie, Rosenbloum & Magie, P. A., Pensacola, Fla., for plaintiff.

George J. Roark, Jr., Pensacola, Fla., and G. Sage Lyons, Mack B. Binion, Lyons, Pipes & Cook, Mobile, Ala., for defendant, McKenzie Tank Lines, Inc.

Warren L. Finch, Mobile, Ala., for defendant, John T. Russell.

A. Dallas Albritton, Jr., Albritton, Sessums & DiDio, Tampa, Fla., for defendant, Mario R. Cabrera.

ARNOW, Chief Judge.

Before the court are defendants' motions seeking summary judgment on Counts I and II of plaintiff's amended complaint.

Plaintiff's amended complaint is in five counts. Counts I and II seek injunctive relief respecting, and damages for, claimed violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Counts III, IV and V seek damages for unfair competition, tortious interference and breach of fiduciary duty.

Both plaintiff, Redwing Carriers, Inc., and defendant, McKenzie Tank Lines, Inc., are authorized by the Interstate Commerce Commission and the respective state public service commissions to haul molten sulfur in the relevant market. For some time prior to August, 1976, Redwing had the entire sulfur hauling trade of Freeport Sulfur Company in the market. On or about August 2, 1976, Freeport tendered a portion of its hauling business to McKenzie, and McKenzie commenced hauling a portion of its molten sulfur. Thereafter this suit was filed.

Plaintiff, citing *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d 547 (1st Cir. 1974), contends unfair competitive practices accompanied by intent to eliminate a competitor by one who is a significant factor in the market constitute a per se violation of Section 1 of the Sherman Act. Under the *Whitten* test, there must be an effort to eliminate a competitor as opposed to intent merely to hurt him. The case in a footnote also notes the importance of potential for actual effect on the market even in per se cases except for price fixing.

In various decisions, a certain few practices[1] have been considered to be so inherently anticompetitive they are deemed to constitute per se Sherman Act violations. Respecting them, no further inquiry into the reasonableness of the restraint on trade or commerce is required.

*Whitten* is a descendant of *Pick-Barth v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir. 1932), *cert. denied,* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). The *Pick-Barth* rule, even as narrowed and limited by subsequent decisions, including *Whitten,* adds to these recognized practices an additional practice as a per se violation.

In cases not governed by the per se rule, there must be evidence of the unreasonableness of the restraint, and at least in Fifth Circuit, evidence that the restraint tends to or is reasonably calculated to prejudice the public interest. *Kestenbaum v. Falstaff Brewing Corp.,* 514 F.2d 690 (5th Cir. 1975); *Rogers v. Douglas Tobacco Bd. of Trade,* 266 F.2d 636 (5th Cir. 1959).

If the *Pick-Barth* rule does not apply, defendants' motions for summary judgment should be granted. The record is devoid of any facts establishing or from which inference could be drawn showing an unreasonable restraint of trade tending or being reasonably calculated to prejudice the public interest.

On the undisputed facts before the court prior to August, 1976, Redwing, for all practical purposes, hauled all of Freeport's molten sulfur in the geographic market. Freeport had the exclusive power to award its sulfur hauling business to whom it

---

1. Price fixing, market allocation, group boycotts, are examples.

pleased provided that person or entity was licensed by the proper regulatory agencies. The hauling is a regulated industry in which prices are determined by governmental regulatory agencies. Since Freeport awarded a portion of its hauling business to McKenzie on or about August 2, 1976, Redwing has maintained a market share of approximately 70% to 83% of Freeport's business with McKenzie servicing the remaining 17% to 30%.

Here there has been no decrease, but an increase, in competition. Even if McKenzie could ever entirely supplant Redwing as a hauler for Freeport—and the indications in the record are to the contrary—there could at most be only the substitution of one hauler for another by Freeport.

As pointed out in the district court's opinion in *Southland Reship, Inc. v. Flegel,* 401 F.Supp. 339, 346 (N.D.Ga.1975), *aff'd* 534 F.2d 639 (5th Cir. 1976):

> But so far as competition is concerned, it makes no difference whether Company A or Company B renders the service involved if there is only one company in the field. If a completely new, previously non-operating company, entirely supplants an existing company, there has been no injury to competition if the quantum of service rendered by the new company equals that of the old.

That is true in this case. There is no evidence the quantum of service rendered by McKenzie is or will be less than that rendered by Redwing. To the contrary, there is evidence the competition between the two companies has increased the quality of service and that Freeport, gratified with the result, has no present intention of awarding its hauling business to either one.

In *Craig v. Sun Oil Co.,* 515 F.2d 221 (10th Cir. 1975), the court held a conspiracy resulting merely in the substitution of one distributor for another does not violate Section 1 of the Sherman Act. It cited in support two of that circuit's prior cases and *Ace Beer Distribs., Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963). It also stated an increase in the number of distributors is not actionable under that section.

Nor is there here anything in the record showing a restraint that tends or is reasonably calculated to prejudice the public interest. The hauling prices are fixed by the regulatory agencies; neither Redwing nor McKenzie, if serving as Freeport's sole hauler, could take advantage of that fact to raise the prices. Moreover, Freeport, having sole power to employ its haulers, may change to another were it dissatisfied with one.

From *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 500–01, 60 S.Ct. 982, 996, 84 L.Ed. 1311 (1940):

> Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition.

Here there is nothing to establish or from which it may be inferred that any restraints that have been imposed, or, for that matter, through elimination of Redwing as a competitor for Freeport's business could be imposed, would or could have any effect upon prices in the market or otherwise deprive purchasers or consumers of the advantages they derive from free competition.

Plaintiffs here have presented evidence of certain practices engaged in by one of the defendants while in plaintiff's employ. Absent that evidence, as plaintiff's counsel stated at hearing, this suit would not have been brought. That defendant is no longer in plaintiff's employ, and there is no evidence in the record from which it may be inferred similar practices arising from such previously existing factual situation may again occur.

The facts before the court, at the most, present strained inference the alleged means employed were performed with the intention of eliminating Redwing as a competitor. They are more consistent with an inference of performance with intention to supplant Redwing at Freeport. In either

event, regardless of the motive and purpose, the means employed have failed to supplant Redwing as a hauler with Freeport, much less eliminate it as a competitor in the market. Under the rule of reason approach, there has been shown here no anticompetitive effect nor even a potential anticompetitive effect which would establish unreasonable restraint of trade.

Thus, on the record, Redwing, on the motions for summary judgment, stands or falls on the question whether the *Pick-Barth* rule, as limited or construed in *Whitten* and other cases, is viable in Fifth Circuit.[2]

In the district court opinion in *Southland v. Flegel, supra,* Judge Moye held the line of cases of which *Pick-Barth* was the progenitor should not be followed.

Alternatively, however, he held "assuming *Perryton* [*Perryton Wholesale, Inc. v. Pioneer Distrib. Co.,* 353 F.2d 618 (10th Cir. 1965), *cert. denied,* 383 U.S. 945, 86 S.Ct. 1202, 16 L.Ed.2d 208] to be representative of the law in this Circuit, nevertheless, under the facts of this case, the principle there announced is not applicable." 401 F.Supp. at 347.

In *Perryton,* a forerunner of *Whitten,* the court held:

The statute [Sherman Act § 1] applies when there is a conspiracy to impose an unreasonable restraint on interstate trade and commerce. This occurs when a conspiracy exists to suppress competition in interstate trade through the elimination of a competitor by unfair means.

353 F.2d at 621.

*Whitten,* critical of the *Pick-Barth* prior cases, held that, to the extent they stood for the broad proposition that unfair competitive practices, accompanied by an intent to hurt a competitor, constitute a per se antitrust violation, their teaching was not now accepted. It also held that where there was an effort to eliminate a competitor through the use of such practices, the per se rule

was proper, at least where, as it put it, there was a "sharply focused effort." On that basis, it did not criticize the results obtained in *Perryton* and in the similar case of *C. Albert Sauter Co. v. Richard S. Sauter Co.,* 368 F.Supp. 501 (E.D.Pa.1973).

The district court in *Southland* was affirmed on appeal, 534 F.2d 639 (5th Cir. 1976). However, the Fifth Circuit held, because it agreed appellant could not prevail even under *Perryton,* it need and did not decide whether the *Perryton* rule should be adopted in Fifth Circuit.

In the progeny of cases spawned by the *Pick-Barth* rule, various courts have followed it, limited it, criticized it and found factual situations different from it. The district court in *Southland* rejected it but ruled alternatively assuming it had application. In one recent case, it has been rejected. *Juneau Square v. First Wis. Nat'l Bank,* 435 F.Supp. 1307 (E.D.Wis.1977).

Under these cases, the focus under the *Pick-Barth* rule is on unfair competition. The conspiracy to eliminate by fair means a competitor by one a significant factor in the market or simply to injure a competitor, even though by unfair means, is not a per se violation. Yet if unfair means are employed with the intent to eliminate the competitor by one a significant factor in the market, at least to the extent unfair means are employed within the competitor's organization, such is a per se violation presuming unreasonable restraint. As with generally accepted per se cases, there is eliminated the rule of reason inquiry into such matters as the particular business, the nature of the restraint and its effect, the reason for the restraint and the purpose or end to be obtained by the means employed.

The Sherman Act was never designed to create a federal remedy for unfair competition. Its purpose was not to protect competitors, but to prevent unreasonable restraint of trade by way of injury to or

---

2. Defendants contend, assuming the rule has application in Fifth Circuit, the evidence presented respecting unfair competition is of such nature their motions should nonetheless

be granted. Because of the conclusion reached, this court finds it unnecessary to resolve that contention.

elimination of competitors. It was not concerned, as are the states' laws of unfair competition, with morality. The courts arrived at certain practices recognized as per se violations of the Sherman Act because they were able to conclude they were so inherently anticompetitive that necessarily unreasonable restraint was present, so that no inquiry respecting such is required. But the intent to eliminate, or the elimination of, a competitor by unfair means no more fits into that reasoning than would the intent to injure a competitor by unfair means, or to eliminate a competitor by fair means, neither of which would constitute a per se violation.

It is the general rule that in per se Sherman Act violation cases no element of intent is a part of the cause of action. *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Thus, the per se rule involved in the *Pick-Barth* cases added the additional element of intent.

Either the injury to or the elimination of a competitor by unfair or fair means of competition might, in particular circumstances presented, constitute an unreasonable restraint of trade violation of Section 1 of the Sherman Act. The intent to eliminate, or the elimination, of a competitor by unfair means, without more, cannot and should not be a violation of the Act. One injured or eliminated by unfair·means with the injury or elimination unaccompanied by evidence of actual—and not presumed—unreasonable restraint of trade should seek his remedy under the laws dealing with unfair competition, and not under the Sherman Act.

This case, in its factual aspects, serves to emphasize that legal conclusion. Here, as pointed out, there has been, in fact, no unreasonable restraint of trade. Yet application of the *Pick-Barth* rule of intent of elimination through unfair competition would permit no inquiry respecting such. Required instead would be the assumption

by the court there was unreasonable restraint of trade, notwithstanding that, on the record before it, none such exists.

This country was brought into existence, and exists, under a form of government recognizing individuals have full right to do as they please subject only to the extent their actions are circumscribed by law. Under it, free enterprise in trade and commerce is fostered with competition in it encouraged. The entrepreneur has the right to engage in practices, whether fair or unfair, right or wrong, moral or immoral, in the conduct and promotion of the business enterprise except to the extent that such practices are prevented by law.

This is not to say that wrongful actions are to be condoned. Undergirding this government and giving it strength are moral principles such as decency, honesty and fairness.

By far, the majority of businessmen and tradespeople in this country subscribe to those tenets and principles. They do so not because they are required so to do by law, but because they believe in and practice them as a part of their personal codes of conduct. From a practical standpoint, many also realize that, when they conduct their business enterprises with fairness and decency to others, in the long run they will profit more because they have done so.[3]

Nonetheless, it remains that such is a code of moral conduct having no force of law unless and until made a part of the law. When the *Pick-Barth* courts engrafted on the Sherman Act by judicial fiat the notation that unfair competition could itself in some circumstances be so inherently anticompetitive that necessarily unreasonable restraint is present, they ignored that fundamental concept of law.

It is understandable that a competitor confronted with what he believes to be unfair competitive practices might seek, at possible risk of unfairness on his part, both unfair competitive law remedies and Sher-

---

**3.** The successes in business of the originator of the Four Way test advocated by Rotary, and of other businessmen following it, provide exam-

ples of the practical value of such business policies.

man Act remedy with its treble damages. Particularly is this true when he is encouraged to do so by the *Pick-Barth* line of cases. It is even understandable the judges of courts applying the *Pick-Barth* principle, confronted with unfair competitive practices they neither approved nor condoned, might react so strongly they could and would arrive at decision that such, with other factors present, would constitute per se violation of the Sherman Act. Yet it still remains that, in so doing, they have presented, as Judge Moye so aptly described it in *Southland,* an aberration in the antitrust laws of this nation. 401 F.Supp. at 347.

As presently existing in this nation, the antitrust law is designed to protect competition; its unfair competition law is designed to protect competitors. The former seeks to prevent unreasonable restraint or lessening of competition; the latter seeks to prevent unfair competitive conduct. Each has its separate place and function in the legal restraints imposed upon society. No court, however well intentioned, has or should have the power by edict to impose upon one aspects peculiar, and pertaining solely, to the other.

This court rejects the *Pick-Barth* rule and holds that on the circumstances and facts presented in this case there is not a per se violation of the Sherman Act. Moreover, as pointed out, there is not a violation under the rule of reason approach, so that defendants' motions should be granted.

There is a further contention presented that should be mentioned.

Under the decisions, for there to be a per se violation in a case of this kind, the violation must have been by one who is a significant factor in the relevant market.

Here the parties are agreed the relevant market is confined to the hauling of molten sulfur from the crude oil and natural gas fields located in Escambia and Santa Rosa Counties, Florida and Escambia County, Alabama.

Defendants, following a percentage share of the market approach mentioned in *Whit-*

*ten,* contend that, as a matter of law, McKenzie was not a significant factor in the market. While there may be merit in the contention, in view of the conclusion reached, it is unnecessary to resolve it.

In reaching decision summary judgment is proper, the warning in *Poller v. CBS,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), that summary judgment in the antitrust area is an available judicial tool to be used cautiously, though dicta, has not been overlooked. As pointed out, with case citations, in *American Tel. & Tel. Co. v. Delta Communications Corp.,* 408 F.Supp. 1075, 1086 n. 12 (S.D.Miss.1976), it is apparent summary judgment has not been discarded as a judicial tool in the field of antitrust law. *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), provides the standard to be used in determining the appropriateness of summary judgment in complicated antitrust cases. That standard, applied in this case, leaves no doubt there is no genuine issue of fact before the court on the question of unreasonable restraint of trade. The holding on the question of per se violation, a conclusion of law, obviously presents no bar to the granting of summary judgment.

At hearing, counsel for plaintiff advised that, if defendants' motions for summary judgment on Counts I and II were granted, the court might also properly dismiss the pendent state claims presented in the remaining counts. In the exercise of discretion, they should be dismissed.

Summary final judgment will be entered in favor of defendants and against the plaintiff with Counts I and II of the amended complaint dismissed with prejudice and with all its other counts dismissed without prejudice. Costs will be taxed against the plaintiff.