**AEROSONIC CORPORATION and Mac-Leod Instrument Corporation, Appellants,**

v.

**TRODYNE CORPORATION, Appellee.**

No. 25257.

United States Court of Appeals
Fifth Circuit.

Oct. 7, 1968.

Norman C. Roettger, Jr., Fleming, O'Bryan & Fleming, Fort Lauderdale, Fla., for appellants.

Joseph J. MacDonald, Ridgewood, N. J., John Cyril Malloy, Miami, Fla., for appellee.

Before TUTTLE, COLEMAN, and MORGAN, Circuit Judges.

COLEMAN, Circuit Judge.

Trodyne Corporation, the successful complainant below, sued Aerosonic Corporation, and its subsidiary, MacLeod Instruments Corporation, as well as Anthony J. Femina, an individual who does not appeal, in a diversity action for unfair competition in trade, tortious interference with contractual and business relations, and for breaches of confidence by Femina as a former trusted officer and director of Trodyne. After trial to the District Court, judgment was entered for the plaintiffs as hereinafter described. We affirm that part of the judgment which granted injunctive relief, but the award of damages must be reversed.

## I. FACTS

Trodyne is engaged in the design, manufacture, and sale of aircraft instruments. In response to an invitation from Sikorsky Aircraft in 1962, Trodyne submitted a design for a pressure sensing device intended to give early warning of fatigue cracks in rotor blades in order to prevent helicopter crashes. The first design was approved and 100 units were ordered. These units proved unsatisfactory and were returned to Trodyne. After several months of additional research, a redesigned unit, Model 1201, was submitted to Sikorsky and proved satisfactory. Due to the production of Model 1201, the plaintiff enjoyed significant commercial success. The percentage of sales by the plaintiff of these pressure sensing devices increased steadily. A patent was applied for, but neither this patent nor the device itself disclosed the manufacturing techniques of the plaintiff. Instead, they remained trade secrets.

Following the production of Model 1201, Trodyne continued to engage in a research program to develop an improved pressure sensing device. This program resulted in Model 1202. After testing, the new model proved worthy of further investment and Trodyne directed efforts toward the production of the new system. To aid in the planning of Model 1202, a main production drawing,

clearly labeled "Trodyne Corporation, 39 Industrial Avenue, Teterboro, New Jersey", was prepared in September, 1965.

Shortly after Trodyne's inception, defendant Anthony J. Femina became a director and officer of the company and worked directly with the development of the sensing devices. In 1965, Femina tried to persuade Trodyne to allow him to move to Florida. There were indications that, prior to this decision to locate in Florida, Femina had attempted to leave the corporation and take certain employees with him to compete with Trodyne.

Late in the Fall of 1965, Femina's employment with Trodyne was severed and he went to work in Florida for Aerosonic. Aerosonic was also engaged in manufacturing instruments for aircraft. About the time Trodyne was formed, Aerosonic had submitted to the same helicopter manufacturers a design similar to the plaintiff's Model 1201 device, but without response.

Aerosonic and Femina entered into an agreement whereby Senseair Division, an unincorporated division of Aerosonic, was created to design and model a pressure sensing device. MacLeod Instrument Corporation, a wholly owned subsidiary of Aerosonic, participated in this agreement by furnishing an office and secretarial services to Femina at Fort Lauderdale and made purchases for him. Senseair became engaged in a "crash program" to produce the devices. Femina was directly responsible for development of the devices.

Shortly after his employment with Aerosonic began, Femina showed the president of Aerosonic a drawing of Trodyne's improved Model 1202, clearly labeled with Trodyne's name and address. Traced copies of the Model 1202 device were then attached by Femina to letters sent to four manufacturers of helicopters, including the plaintiff's best customer. These letters bore Senseair's letterhead. The letters showed a specification list which included words and phrases used by the engineering staff of Trodyne, compiled by Femina when employed there and retained by him after his discharge. After referring to to the sealing and leaking problems of Model 1201, these letters offered to supply the Model 1202 [before Trodyne could supply it].

While Femina was with Trodyne, it had manufactured certain parts for Perkin Elmer Corporation and invested $7,000 in equipment to secure the work. After Femina's separation from Trodyne, Trodyne received no more orders from Perkin Elmer; instead, the same parts were made for Perkin Elmer by Aerosonic. At least one payment of $1,600 was made to Aerosonic and turned over to Femina.

Upon learning of the letters containing the Model 1202 drawing, plaintiff complained to Aerosonic and Femina of the apparent violation of its trade secrets. The president of Aerosonic advised Trodyne that it had no intention of discontinuing its activities and that Trodyne should pursue its remedy by a suit in federal court. The joint efforts of Aerosonic and Femina continued until the Fall of 1966.

On May 2, 1966, Trodyne filed suit. By decree rendated May 6, 1967, the court found that Trodyne's trade secrets were disclosed to Femina in confidence while he was an employee of Trodyne and that he breached his duty to them by disclosing these secrets to Aerosonic and MacLeod. It was further found that appellants and Femina engaged in a joint venture to divulge and utilize these trade secrets. These findings were unchallenged on appeal.

## II. THE INJUNCTION

An injunction issued

"That the defendants, Anthony J. Femina, Aerosonic Corp., and MacLeod Instrument Corporation, and each of them, their officers, agents, servants and employees, and all acting by, through, under, or in consort with them in any manner whatsoever, whether directly or indirectly, be and they are hereby permanently enjoined

in any manner or form, directly or indirectly, from making or selling pressure sensing devices for the leak detection system of helicopter rotor blades."

Damages were assessed in the sum of $15,000.00.

Appellants argue that the injunction is too broad in scope and in time.

 Under Florida law the issuance of an injunction is within the sound discretion of the court and the exercise of this discretion will not be disturbed unless an abuse is clearly shown, United States Fire Insurance Company v. Brown, 3rd D.C.A.Fla., 1966, 185 So.2d 11. This Court has stated that the framing of an injunction appropriate to the facts of the case is a matter peculiarly for the consideration of the trial court, J. M. Fields of Anderson, Inc. v. Kroger, 5 Cir., 1965, 330 F.2d 686. The Florida courts do hold that an injunction "should never be broader than is necessary to secure to the injured party, without injustice to the adversary, relief warranted by the circumstances of the particular case", Florida Peach Orchards, Inc. v. State by Dickinson, 1st D.C.A. Fla., 1966, 190 So.2d 796; see also, Moore v. City Dry Cleaners & Laundry, Fla.1949, 41 So.2d 865.

Apparently there are no Florida decisions concerning injunctions dealing with trade secrets as such but this Court has stated that the Florida law of unfair competition is the same as prevailing in American Jurisprudence generally, Creamette Co. v. Conlin, 5 Cir., 1951, 191 F.2d 108.

The Fifth Circuit has not previously confronted the identical question here presented and it would appear that other Circuits have been divided on the subject.

In Shellmar Products Co. v. Allen-Qualley Co., 87 F.2d 104 (1936) the Seventh Circuit affirmed a decree permanently enjoining a defendant who by breach of confidence had learned of and copied a secret process for wrapping food products. Later, however, that Circuit, although citing Shellmar with approval, held that while the defendant should be enjoined only from making further use of the information received from the plaintiff's confidence, he should not be restrained completely from continuing to engage in a competing business with the plaintiff, Smith v. Dravo Corp., 7 Cir., 1963, 203 F.2d 369.

In A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 1935, 74 F.2d 934, a permanent injunction was issued against a defendant who had obtained trade secrets illegally, even though the plaintiff's product was in the public domain.

The Second Circuit has held that an injunction did not have to be limited to the time when the trade, by legitimate means, caught up with the plaintiff. Instead, the Court felt that the trend was to place increasingly higher standards of commercial morality in trade generally, Franke v. Wiltschek, 2 Cir., 1953, 209 F.2d 493. In dissenting, one judge was of the view that this was not a proper case for a permanent injunction because the product involved was a slight, easily discoverable improvement. But he did agree that where the copied device was a "novel invention" and the inventor chose not to patent it but to keep it to himself, "a perpetual injunction affords a proper protection—a protection as enduring as the monopoly grounded on the secret invention".

In an earlier case the Second Circuit enunciated what became known as a Conmar rule, whereby a person who had unlawfully obtained a trade secret from another was enjoined from using the information and producing the copied product only until the plaintiff dedicated it to the public, Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 1949, 172 F.2d 150.

The Ninth Circuit, in a case where former employees of the plaintiff had used secrets while employed by the plaintiff to develop tape recorders, rejected both the plaintiff's argument that the defendants should be permanently

enjoined from manufacturing tape recorders and the defendants' argument that public disclosure ended the defendants' duty to maintain the information in confidence. Rather, the Court thought that the district court approach, enjoining the defendants from the manufacture of the recorders and the disclosure of the information for two years, was sound, Winston Research Corp. v. Minnesota Min. & Mfg. Co., 9 Cir., 1965, 350 F.2d 134.

■ On the facts of this case we find it unnecessary to exercise a choice as to the divergent views above enumerated. Here the right to relief was beyond question and the court was faced with the task of fashioning a decree which not only would be fully remedial but which could be enforced with reasonable certainty. Appellants declined to reveal the nature or extent of any designs they legitimately owned or used before they appropriated the trade secrets of Trodyne; thus, they denied the trial court any opportunity of specifically exempting the future use of such designs. Moreover, the court found, supported by the record, that appellants had never engaged in any significant use of such designs prior to the activity which the court was compelled to stamp out. Therefore, under well defined rules of equity the injunction below was not an abuse of discretion and did not go beyond that necessary to secure to the injured party, without injury to the appellants, the relief warranted. The injunction must be affirmed.

## III. DAMAGES

The appellants contend that as to damages the judgment of the court below must be reversed in its entirety.

The findings of fact on damages consisted of the following:

"The plaintiff has suffered actual damages by reason of the divulgence and utilization of its trade secrets in the defendant's 'crash program' and the disparagement of its 1201 product to its customers. The plaintiff has also

been damaged by the defendants by reason of wrongful interference with its aforesaid business relations. The plaintiff also has been damaged and obligated to pay in excess of $12,500.00 in attorney fees and expenses to prosecute this action to protect its property."

The conclusions of law were as follows:

"The divulgence and utilization of the plaintiff's trade secrets has caused the plaintiff damage, the exact amount of which is difficult to prove.

"The interference by the defendants with the plaintiff's existing favorable and advantageous business relations with its customer for making parts caused damage to the plaintiff which is actionable."

\* \* \* \* \* \*

"The plaintiff is entitled to $150,000.00 damages and costs of this suit against Femina and Aerosonic jointly and severally."

### III (a). ATTORNEY FEES

9 Fla.Jur., Damages, Section 77, reads as follows:

"Ordinarily, in the absence of any contractual or statutory liability therefor, attorneys' fees and expenses incurred by the plaintiff or which the plaintiff is obligated to pay, in the litigation of his claim against the defendant, are not recoverable as an item of damages whether in an action ex-contractu or an action ex-delicto."

■ This proposition is well established by Florida decisions. See Dickson v. Feiner's Organization, Inc., 4th D.C.A.Fla., 1967, 200 So.2d 269; Duncan v. Pullum, 2nd D.C.A.Fla., 1967, 198 So. 2d 658. In an action against a corporation for defrauding its creditor the Florida Supreme Court held that it was "committed to the doctrine that attorneys' fees cannot be taxed as costs in any cause unless authorized by contract or legislative authority", Codomo v. Emanuel, Fla., 1956, 91 So.2d 653. The

Court did say that fraud or malice could modify the rule in some circumstances, *Codomo* at 655.

 Appellee suggests that the Supreme Court in Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), held that allowance by federal courts in equity suits of counsel fees and other expenses entailed by the litigation but not included in the ordinary taxable costs recognized by statute is part of the historic equity jurisdiction of federal courts. It is true that the Supreme Court so held, but it was not considering a diversity case. The litigation involved the liquidation of a national bank under the provisions of an Act of Congress. It is not to be doubted that where the jurisdiction of the federal court is based on the existence of a federal question, federal law applies as to both substance and procedure, Atlantic Coast Line R. Co. v. Dixon, 5 Cir., 1953, 207 F.2d 899, but this is not the rule for diversity cases.

 Since Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 (1938) it is the law that where federal jurisdiction is based on diversity of citizenship and not on the federal Constitution or some Act of Congress, a federal court is in effect only another court of the state in which it sits and applies the same law that would be applied if the action had been brought in state courts. It follows that in diversity cases the federal courts cannot allow recovery if the right to recover is denied by the state, and this is true regardless of the form of the action and whether the remedy is sought at law or in equity, Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231 (1945), rehearing denied 326 U.S. 806, 66 S.Ct. 7, 90 L.Ed. 491. The outcome of litigation in federal court with respect to a state created rights should be the same as it would be in the state court, Guaranty Trust Co. of New York v. York, supra; Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). On this line of authority, since attorneys' fees in this case could not have been allowed *as such* by a state court the United States District Court had no authority to allow them.

It is to be noted that the District Court alluded to attorney fees in its findings of fact but the items of damage were not enumerated or specified in either the conclusions of law or the final judgment. Neither does the Court expressly indicate whether it is allowing compensatory damages or punitive damages or both. The complaint did demand punitive damages and such other relief as may be just and proper. On these considerations it might be thought that the Court really intended to impose punitive or exemplary damages but for the decision of 3rd D.C.A.Fla. in Orkin Exterminating Co. of So. Fla., Inc. v. Truly Nolen, Inc., 117 So.2d 419 (1960), cert. denied 120 So.2d 619, in which it was held that in Florida courts of equity may not grant punitive damages unless authorized by statute to do so. Specifically, the Court said, "[w]e hold that a chancellor is without authority to enter a judgment for punitive damages * * *" The issue of whether a court, sitting in equity, may empanel a jury to decide issues of punitive damages was decided in the negative by the 3rd D.C.A. in R. C. #17 Corp. v. Korenblit, 207 So.2d 296 (1968). In any event appellee did not move the court below to empanel a jury to try the issue of punitive damages.

## III (b). DAMAGES FOR WRONGFUL INTERFERENCE WITH PLAINTIFF'S BUSINESS

The District Court, in its findings of fact, stated:

"While the defendant Femina was employed by Trodyne, an advantageous business relation existed between plaintiff and a customer (The Perkin Elmer Corporation) whereby certain parts were regularly manufactured for it by plaintiff. To secure this work

the plaintiff invested about $7,000 for special tooling. Following the discharge of Femina, no further work of this type was received; and, later, it was learned that the same parts were being made by defendant Aerosonic for the customer for which at least one payment in the sum of $1,600 was made to the defendant Aerosonic and which in turn was given to the defendant Femina."

The Court concluded that this was a wrongful interference with the plaintiff's business relations and considered it as an element of damages. The defendants assert that this sum received from Perkin Elmer is not a proper element of damages.

 The Court made no finding that the identity of the customer was a trade secret or that it was illegally obtained by the defendants. It appears that the Court is saying that the defendants are liable for diverting an established customer Trodyne as a result of Femina's knowledge of the business relation with Perkin Elmer while he was employed with Trodyne.

The Florida courts do not support this proposition. Where former employees of the plaintiff began working for a competitor and solicited their former employer's customers, the Florida Supreme Court, in denying an injunction to prohibit this, felt that there was no justification for "condemnation of appellee's erstwhile employees because they undertook to sell to customers whom they had come to know during their former employment". Pure Foods v. Sir Sirloin, Inc., Fla.1955, 84 So.2d 51, 53. A similar result was reached where former officers of the plaintiffs engaged in a competing business used the plaintiffs' customer list, and became distributors of products for which the plaintiffs had previously been distributor. The Court succinctly stated:

"Generally, in the absence of an express contract equity will not enjoin an agent or employee, after cessation of his employment, from soliciting business from customers of his former principal or employer where no business secret or trust had been reposed in him because of this relationship. Knowledge acquired by an employee concerning names and addresses of customers is not the property of the employers unless such has been obtained in confidence. * * * Not all knowledge gained by an employee or agent is confidential and in such instance equity has no place in restriction of its subsequent use."

Renpak, Inc. v. Oppenheimer, 2nd D.C. A.Fla., 1958, 104 So.2d 642. (There was no contention that any trade secrets were taken). The Court continued:

"* * * where a former employee is engaged in business as a manufacturer or wholesaler dealing primarily with retail merchants or jobbers, or sells to members of a readily ascertainable class, the knowledge of names of the customers of the employer which a former employee has is not a 'trade secret' which equity will protect through injunction."

*Renpak* at 645, 646.

 This case is not distinguishable from *Renpak*, supra, as the appellees assert, simply because no trade secret violation was alleged there. Although a trade secret violation is conceded here, the plaintiff does not contend that the Court did not find that there was any "trade secret" involved in the identity of the plaintiff's customers. There is no evidence which indicated that the name of the customer was obtained fraudulently or by breach of confidence. The District Court stated merely that an "advantageous" business relationship had existed between Trodyne and Perkin Elmer. Absent special circumstances, there is no prohibition of an employee soliciting customers with which his former employer had prior dealings.

Therefore, it was error for the Court to include this as an element of damages.

## III (c). DAMAGES FOR DISPARAGEMENT

Appellants contend that the Court erred in holding that the letters sent from Femina to various helicopter manufacturers, which mentioned Trodyne's Model 1201, constituted actionable disparagement.

Basically, actionable disparagement is a "statement about a competitor's goods which is untrue or misleading and which is made to influence or tends to influence not to buy. 'Nims, Unfair Competition by False Statement or Disparagement, 19 Cornell L.Q. 63, 70' ". Edwin L. Wiegand Co. v. Harold E. Trent Co., 3 Cir., 1941, 122 F.2d 920. Mere puffing of one's product, claiming its superiority over a competitor's product, is not disparagement. As was stated in Smith-Victor Corp. v. Sylvania Electric Products, Inc., N.D.E. D.Ill., 1965, 242 F.Supp. 302, "as long as the comparison attempts primarily to enhance the quality of the advertiser's product without being unduly critical of the other's product, there can be no disparagement. * * *" Smith-Victor at 308.

However, it is equally true that a person

"has no right to issue and publish an untrue or deceptive statement of facts which has the disparaging effect upon the quality of another's property, under circumstances which would lead a reasonable person to foresee that it will have such effect. The making of such statement in such circumstances is tortious."

Paramount Pictures v. Leader Press, 10 Cir., 1939, 106 F.2d 229.

If the complaint of disparagement is based on unfair competition and not libel, no special damages need be alleged or proved if the plaintiff showed present or possible injury. *Wiegand,*

*supra;* see also, Royer v. Stoody Co., W.D.Okla., 1961, 192 F.Supp. 949.

There can be no question that the letters sent by Femina contained false and misleading statements in claiming that the defendants had a superior product, when in fact they had only a copy of Trodyne's Model 1202 device. Although it was true that Model 1201 did have flaws, the letters unduly and inaccurately emphasized this by the claim that Aerosonic had a better product ready for marketing. It was not error for the trial court to consider these letters in determining damages.

Nevertheless, there is no proof of actual damages sustained by the appellee as a result of this impermissible activity. So far as we can tell from the record, the appellants sold nothing as a result of the activity and the appellee lost no sales as a consequence of it.

## III (d)—APPELLANTS' CONTENTION THAT THE DAMAGE AWARD IS NOT SUPPORTED BY THE EVIDENCE

Aerosonic and MacLeod argue finally that the Court's award of $15,-000.00 damages is, for the following reasons, not supported by the evidence: (1) plaintiff suffered no pecuniary damage as a result of the divulgence of the trade secrets; (2) plaintiff failed to prove damages as a result of the defendants' disparagement; (3) defendants did not wrongfully interfere with plaintiff's established business relations with Perkin Elmer; and (4) attorneys' fees are not allowable.

In the light of the considerations hereinabove discussed as to each of these points, we must regard appellants' contentions as well taken, and that part of the judgment of the District Court awarding damages must be reversed.

As to the injunction granted, affirmed.

As to damages awarded, reversed.