| AMOUNT PAYABLE IN 36 MONTHLY INSTALLMENTS | FACE AMOUNT OF CONTRACT | MAINTENANCE CHARGE | FINANCE CHARGE | SECURITY INTEREST | REAL ESTATE DEED | ANNUAL PERCENTAGE RATE |
|---|---|---|---|---|---|---|
| | $3150.00 | $72.00 | $1167.00 | YES | NO | 22.757% |

MANUFACTURING RESEARCH CORPORATION, a Florida corporation, Plaintiff-Appellee-Cross Appellant,

v.

GREENLEE TOOL COMPANY, a corporation, Defendant-Appellant-Cross Appellee.

No. 80–5175.

United States Court of Appeals, Eleventh Circuit.

Dec. 13, 1982.

Maguire, Voorhis & Wells, James E. Slater, Orlando, Fla., for defendant-appellant-cross appellee.

Duckworth, Hobby & Allen, Herbert L. Allen, Orlando, Fla., for plaintiff-appellee-cross appellant.

Before GODBOLD, Chief Judge, RONEY and WOOD *, Circuit Judges.

RONEY, Circuit Judge:

Greenlee Tool Company (Greenlee) appeals from a $549,562.64 judgment obtained by Manufacturing Research Company (MRC) on a common law unfair competition claim. The suit grew out of the competition between the two companies in the manufacture and sale of a tool used in the electrical construction trade, known as a power cable bender. Both as to appeal and cross-appeal, we affirm.

On the main appeal Greenlee contests the judgment based on a jury verdict on four grounds: (1) the sufficiency of the evidence as to the tort of trade disparagement or the tort of interference with advantageous business relationships, (2) the trial court's refusal to instruct the jury on the issue of puffing, (3) the trial court's denial of its motion for judgment notwithstanding the verdict and order of a partial retrial, and (4) the sufficiency of the evidence at the retrial on damages.

MRC had originally asserted Sherman Act claims and appeals from a directed verdict against it on a count under § 2 of the Act, alleging an attempt to monopolize. MRC also claims on cross-appeal that the trial court erred in (1) denying its motion to compel discovery seeking to establish Greenlee's market power in the conduit bender market and (2) refusing to permit certain deposition testimony to be read to the jury.

### Background

When Silas Crees invented a tool that filled a need in the electrical contracting industry, he formed the plaintiff corporation MRC to manufacture and sell the power cable bender to electrical wholesale supply houses. A cable bender is used to bend large diameter electric cable within the limited confines of a panel or terminal box. Before its invention the task was usually accomplished with the use of hand tools. The MRC power cable bender first appeared on the market in October 1970.

Early in 1971 defendant Greenlee, a well established company that markets a wide range of products for the electrical trade, became aware of the MRC power cable bender and began efforts to develop its own. A ratcheting cable bender was introduced by Greenlee in March 1973 and a power cable bender in May 1975. Both MRC and Greenlee marketed their products by employing salesmen who sold the tools to electrical wholesale supply houses or distributors that in turn sold the tools to the electrical contractors who were the end users.

The activity of Greenlee prior to marketing its own power cable bender is the basis for this suit. Beginning in May 1971 various Greenlee employees made statements to the effect that Greenlee would have a power cable bender that was better and cheaper than MRC's on the market soon, shortly, or in a few months. These statements were made at trade shows, at distributor warehouses, and elsewhere to the trade, even though Greenlee had no such power tool and was not to market it until some four years later. Although MRC's sales rose from the introduction of its cable bender in October 1970 until June 1971, when the rumors started, by 1975 it was no longer a viable force in the market. Thinly capitalized, MRC eventually went out of business in May 1977 by sale of its assets to Electro-vision, Inc.

### Sufficiency of Evidence as to Economic Torts

 At the first trial of this case, the jury on two special interrogatories found

---

* Honorable Harlington Wood, Jr., U.S. Circuit Judge for the Seventh Circuit, sitting by desig-

nation.

that Greenlee did engage in unfair competition which proximately caused damage to MRC. Included within unfair competition is the tort of interference with business relations. Under Florida law its elements are (1) the existence of a business relationship under which plaintiff has legal rights, (2) an intentional and unjustified interference with that relationship, and (3) damage to the plaintiff as a result of the defendant's actions. *Wackenhut Corp. v. Maimone,* 389 So.2d 656 (Fla. 4th D.C.A.1980).

The jury verdict should be upheld if there is evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. The evidence is considered in the light and with all reasonable inferences most favorable to the opposing party. *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969).

There was substantial evidence presented that Greenlee employees made statements that Greenlee would soon make available a better, cheaper cable bender at a time when there was no reasonable basis for such claims. These statements were made in 1971 and 1972 to persons involved in the electrical contracting business, principally at various trade shows throughout the country. Contrary to these statements, Greenlee's hand-operated cable bender was not introduced until March 1973, and Greenlee's power cable bender was not introduced until May 1975. There was evidence that one sales representative and one potential investor in MRC relied, at least in part, on the rumor concerning the imminent appearance of Greenlee's cable bender in deciding to terminate their relationships with MRC.

■ The jury had sufficient evidence before it to find Greenlee liable for interference with advantageous business relationships. MRC had established a business relationship with its sales representatives and various distributors of its product. The statements attributed to Greenlee employees were made without a basis in fact. Even though Greenlee had begun development of a power cable bender of its own, the tool's appearance on the market was far

from imminent. The jury could have concluded the statements were either calculated to diminish the market for MRC's cable bender or made knowing the market was substantially certain to be diminished. The question of justification involves a balancing of the interests of the parties and of society as well as consideration of all the circumstances including the methods and means used and the relation of the parties. *Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc.,* 384 So.2d 303, 306–07 (Fla. 5th D.C.A.1980). Although businesses are accorded leeway in interfering with their competitors' business relationships, they must abide by certain "rules of combat" and not use improper means of competition. W. Prosser, *Torts* 956 (4th ed. 1971). Accordingly, "when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *Restatement of Torts 2d* § 767 comment 1.

### Puffing

■ Greenlee's second argument is that the trial court erred in refusing to instruct the jury with regard to puffing. The trial court ruled that Greenlee was not entitled to a jury instruction on puffing because at the time the statements were made Greenlee had no product.

■ Puffing generally refers to an expression of opinion not made as a representation of fact. *Gulf Oil Corp. v. Federal Trade Commission,* 150 F.2d 106, 109 (5th Cir.1945). Sellers of goods are given some latitude in enhancing the quality or value of their wares. *Id.* Statements made to puff goods are not actionable in misrepresentation even if untrue on the theory that no reasonable person would rely on general claims of superiority made by a salesman. W. Prosser, *supra* at 722. *See also* 1A R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 5.19 (4th ed. 1981) (exaggerations should be allowed only where the

ordinary purchaser understands he is not expected to rely). Where puffing is involved, the seller is entitled to an instruction along these lines.

Each of Greenlee's requested jury instructions deals with the limited protection afforded sellers in making comparisons of their products with competitors' products. Greenlee, however, did not in fact have a cable bender at the time the statements in question were made and could not have marketed its cable bender soon after the statements were made. The statements complained of were made in 1971 and 1972 even though Greenlee's hand-operated bender was not marketed until September 1973 and its power cable bender was not marketed until May 1975. In March 1971 Greenlee's engineering department developed design sketches of a hydraulic bender that were abandoned in favor of an outsider's prototype. Field tests of the prototype did not begin until the summer of 1972. In short, Greenlee had nothing to be puffed at the time the statements were made. The requested instructions are not applicable in such a situation.

■ The damaging feature of the statements was that Greenlee's product would be available shortly. This was a factual misrepresentation. Greenlee did not even have a product in the final development stage, nor would one be available soon. Statements misrepresenting a product or falsely ascribing benefits or virtues to a product are actionable. *Gulf Oil Corp. v. Federal Trade Commission,* 150 F.2d at 109; W. Prosser, *supra* at 926. The jury instructions included adequate instruction on misrepresentation of material facts.

### Judgment Notwithstanding the Verdict

■ The jury returned a verdict against Greenlee for lost profits in the amount of $67,218.25 and for loss in value of MRC's business in the amount of $286,752.50. The trial court subsequently ordered a remittitur in the amount of $238,707.75 or, in the alternative, a new trial on damages. After the retrial on damages the jury returned a verdict against Greenlee and found lost profits in the amount of $182,562.64 and loss of value in MRC's business in the amount of $367,000.00. Rather than a new trial on damages, Greenlee contends it was entitled to judgment n.o.v. after the first trial.

Contrary to Greenlee's argument, there appears to be no error in the trial court's refusal to grant judgment notwithstanding the verdict. Although the trial court stated the testimony of MRC's expert as to the loss in value of its business was too speculative to support the jury verdict, it did not hold that MRC had failed to prove any damage. The fact of damage proximately caused by Greenlee's conduct was specifically found by the jury in the special interrogatories. Holding that the jury award was against the weight of the evidence, the trial court entered an order for remittitur or, in the alternative, a new trial on damages only. Reviewable under the abuse of discretion standard, *see Love v. Sessions,* 568 F.2d 357 (5th Cir.1978), the trial court's decision to give a new trial was not reversible error.

### Partial Retrial on Damages

■ Greenlee objects to the retrial solely on the issue of damages, contending the issues of liability and damages are so interwoven in this case that they cannot fairly be tried separately. *See Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931); *Atkinson v. Dixie Greyhound Lines,* 143 F.2d 477, 479 (5th Cir.), *cert. denied,* 323 U.S. 758, 65 S.Ct. 92, 89 L.Ed. 607 (1944). Greenlee argues that no finding was made as to which statements were found by the first jury to be tortious. On retrial the jury was able to assume each incident was tortious and left only to determine causation and damages. The defendant, however, did not object to special interrogatories nor did it request any interrogatories to make the distinction it now asserts. The jury specifically found liability. The repetition of some of the liability evidence, necessary to establish causation, did not render the trial unfair. Trial of damages alone after liabili-

ty is an established practice. *See, e.g., Shelak v. White Motor Co.,* 581 F.2d 1155 (5th Cir.1978); 6A J. Moore, *Federal Practice* ¶ 59.06 (2d ed. 1982); Annot., 85 A.L.R.2d 9 (1962). We find no abuse of discretion by the trial judge. *See United States v. Horton,* 622 F.2d 144 (5th Cir.1980).

### Sufficiency of the Evidence at Retrial

Greenlee's final contention on appeal is that there was insufficient evidence as to causation and damages adduced at retrial to present a jury question. The fact of injury was well established. MRC's sales dropped off dramatically at the time the rumor began to be circulated, Gonzalez testified he lost interest in investing in MRC on hearing that Greenlee was going to introduce a cable bender "in the very near future," Roth testified he ceased representing MRC on the basis of innuendos about Greenlee's tool, Burnside testified he decided against investing in or representing MRC after learning that a Greenlee cable bender would be on the market soon, and Childers testified he stopped actively promoting as a manufacturer's representative the MRC bender when he heard Greenlee's bender was about to be marketed. There was also testimony from several witnesses that they had been unsuccessful in efforts to locate an MRC bender. The jury could have inferred that the rumor concerning Greenlee's bender caused the disinterest of salesmen, distributors and others in the MRC cable bender.

While the amount of damages presents a more difficult question, the record supports the trial court's refusal to disturb the jury verdict. By its very nature the valuation of lost profits is a matter of some imprecision. *See New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.,* 122 Fla. 718, 166 So. 856, 860 (1936) (anticipated profits are speculative and dependent on changing circumstances). This inherent uncertainty does not, however, preclude recovery of damages proved to a reasonable certainty. *Aldon Industries, Inc. v. Don Myers & Associates, Inc.,* 517 F.2d 188, 191 (5th Cir.1975).

Although the fact that MRC had not been in business long makes it difficult to forecast future sales, it is not impossible. Short base periods for the comparison of sales have been used in other cases where necessary. *See, e.g., Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 983 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978) (five months); *Mechanical Wholesale, Inc. v. Universal-Rundle Corp.,* 432 F.2d 228 (5th Cir.1970). In this case one witness used six months as the period during which MRC made sales unfettered by any rumors, and one used a one-year period to estimate lost sales. Comparison of sales before the unfair competition with sales afterwards is one of the generally recognized methods of proving lost profits. *See Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 667 (5th Cir.1974), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975).

Greenlee's objections to the testimony of the witnesses are of the type properly addressed to the jury. The fact that the jury's verdict was less than the figures proposed by MRC indicates the jurors accorded some credence to Greenlee's vigorous attack on the figures and methods employed by the witnesses. The arguments do not afford a basis for setting aside the jury verdict.

### Cross-Appeal

■ MRC has cross-appealed from three rulings by the trial court, all dealing with its claim that Greenlee attempted to monopolize the cable bender market in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2. We hold the trial court did not err in refusing to compel discovery by which MRC sought to establish Greenlee's market power in the conduit bender market, in excluding testimony concerning Greenlee's conduct in the conduit bender market, and in granting Greenlee's motion for directed verdict on the counts alleging conspiracy to monopolize and attempted monopolization. Citing several Fifth Circuit cases, MRC reasons that Greenlee's market power coupled with its unfair competition amount to a

violation of the Sherman Act. We agree with the district court that the relevant market was the cable bender market, and therefore the district court correctly denied discovery of Greenlee's conduit bender sales.

In *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979), the Court indicated a violation of the Sherman Act could be found in the anticompetitive conduct of a new entrant with dramatic market power. *Id.* at 89. *Cherokee Laboratories, Inc. v. Rotary Drilling Services, Inc.,* 383 F.2d 97 (5th Cir.1967), *cert. denied,* 390 U.S. 904, 88 S.Ct. 816, 19 L.Ed.2d 870 (1968), was cited as an example. In that case the new entrant into the market controlled supply through an exclusive dealing arrangement with the holder of a patent and was able to increase price significantly while serving a small portion of the market. In a later case the defendant was shown to have dramatic market power in the aircraft outfitting business it had recently entered. *Associated Radio Service Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981). Defendant surmounted the high entry barrier to the market by theft of plaintiff's trade secrets and employees and then demonstrated market power in the outfitting business by increasing prices and profits and by its exclusive worldwide dealership of the aircraft in question. *Id.* at 1353.

Greenlee does not control supply in the cable bender market, nor has it increased price or made excessive profits. There was no evidence that Greenlee ever coerced a distributor not to stock a competitor's product. Greenlee's success with other products may have aggravated the damage to MRC caused by the rumor campaign, but it did not represent dramatic market power in a market it had not yet entered. Nor do conduit benders and cable benders constitute a cluster of products. Different services were lumped together in *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), and in *United*

*States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), only because demand forced competitors to offer the entire cluster of services as effectively one product. The same cannot be said of tools for electrical contractors as seen by MRC's initial success on the basis of one tool.

■ Furthermore, MRC has failed to demonstrate any cognizable anticompetitive effect of Greenlee's unfair competition. Our cases have recognized that injury to a competitor need not always result in injury to competition. The use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws. *Redwing Carriers, Inc. v. McKenzie Tank Lines, Inc.,* 594 F.2d 114 (5th Cir.1979), *affirming* 443 F.Supp. 639 (N.D.Fla.1977); *Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d at 90; *Southland Reship, Inc. v. Flegel,* 401 F.Supp. 339 (N.D.Ga.1975), *aff'd,* 534 F.2d 639 (5th Cir.1976). The number of competitors in the cable bender market has increased, the number of available products has increased, and the price of available products has decreased. No anticompetitive effect on the market can be shown. Accordingly, we affirm the district court's grant of directed verdict in favor of Greenlee on the attempted monopolization count.

■ We find no abuse of discretion in the exclusion of the deposition testimony because its potential for prejudice outweighed its probative value. No proof of any connection between Greenlee's conduct in the conduit bender market and that in the cable bender market was offered. The testimony of Van Bree may have shown the existence of Greenlee's power to coerce distributors, but no use of such power was shown with respect to any product.

Finally, the only foundation for Larson's estimate of the percentage of Greenlee power benders sold in his sales territory as opposed to Enerpac benders was that Enerpac was the only other brand he saw in his territory. This is clearly insufficient information on which to base such a comparison.

Even if there were an adequate foundation for Larson's testimony, Greenlee's share of the conduit bender market has been determined to be irrelevant to the cable bender .market. We affirm the trial court's exclusion of this testimony.

AFFIRMED.

GODBOLD, Chief Judge, dissenting:

I would reverse on the unfair competition claim.

No party contends that there is a general tort of "unfair competition" in Florida. Rather unfair competition is a generic term that covers several categories of specific torts. This case went to the jury on two specific theories, trade disparagement of a competitor's product and unjustified interference with business relations. The evidence and rulings of the trial court must be examined in terms of these two torts.

### A. Disparagement

The Florida law on disparagement of a competitor's goods is stated in our opinion in *Aerosonic Corp. v. Trodyne Corp.,* 402 F.2d 223, 231 (5th Cir.1968) (emphasis added):

> Basically, actionable disparagement is a 'statement [1] about a *competitor's goods which is [2] untrue or misleading and which is [3] made to influence or tends to influence not to buy.* [Citations omitted].' Mere puffing of one's product, claiming its superiority over a competitor's product, is not disparagement .... As was stated in [citation omitted], 'as long as the comparison attempts *primarily to enhance the quality of the advertiser's product* without being *unduly critical* of the other's product, there can be no disparagement.' [citation omitted].

The trial court charged the jury on trade disparagement as follows:

> As a consequence, the Plaintiff claims that it has a right to recover damages from the defendant on either of two legal theories of unfair competition.
>
> Under the first theory, which is known as trade disparagement, you may find for the Plaintiff if you find from the greater weight of the evidence, that the Defendant, through its agents or employees actually made some of the statements about the Plaintiff's product attributed to it by the Plaintiff.
>
> That the statements attributed to the Defendant constituted a misrepresentation of the material fact.
>
> That the statements were made for the purpose of influencing others not to buy the Plaintiff's product, or were made under circumstances which would lead a reasonable person to foresee that such statements would likely influence others not to buy the Plaintiff's product.
>
> And that the Plaintiff has sustained damages which were proximately caused by the publication of the Defendant's statements.
>
> With regard to the second element which you must find under this theory, you are instructed that a statement that something is to occur in the future can be considered a misrepresentation of fact only if the person making the statement had no reasonable basis for that statement at the time he made it.

T.1814–15.

Greenlee requested instructions on "puffery," the privilege of a seller of goods to engage within an allowable range in boasting or "sales·talk" about its goods. The court refused to instruct on puffery on the ground that puffery had no application where defendant's product was not in existence. This theory has been adopted by the majority in this court, with minimal analysis and without citation of authority.

The claimed acts of Greenlee's disparagement of MRC's product are these:

(1) Greenlee employees actively spread the news at trade shows that Greenlee would soon market a better hydraulic cable bender for much less money.

(2) On two occasions Greenlee employees said its product would work in more confined spaces.

(3) On one occasion a Greenlee employee masqueraded as an MRC representative and told a potential customer that MRC was out of hydraulic cable benders.

The representations under (2) were not accurate. Greenlee's cable bender, when it came out, would not work in more confined spaces. If this were the sole disparagement involved I could join in a holding that the court was not required to instruct the jury on puffery. The statement gave specific misinformation about MRC's product through comparison with a quality that Greenlee's product was said to have but that in fact it did not have.

The acts described in (3) were acts of disparagement, asserting a negative falsehood that MRC's product was not available. Puffery has nothing to do with this occurrence.

With respect to acts described under (1), the defendant was entitled to an instruction on puffery. The majority opinion decides as a matter of law that puffery was not involved because Greenlee's product had not been sufficiently developed and because it would not be available "soon." Whether these inaccuracies are within the permissible range of puffery should be decided by a properly instructed jury, not by judges in their appellate chambers. The majority's approach misconceives the principles that underlie the tort of trade disparagement and ignores the realities of the market place.

In our free-market competitive economy the seller is permitted to advertise and promote his product and loudly proclaim its virtues. Within acceptable limits that may be determined by a fact-finder case by case, our world accepts hyperbole by sellers. The tort of trade disparagement, brought over from equity, is not a roving commission to enforce precise standards of morality on the part of competing vendors. Rather it is concerned with the extent to which the seller should be allowed to sell not on the merits of his goods but on the alleged deficiencies of his competitor's. Callman, Unfair Competition Trademarks and Monopolies, § 11.05, p. 13.

The law of product disparagement prevents diversion to defendant of plaintiff's potential sales by defendant's disparaging plaintiff's goods. Disparagement may, of course, be directly done, as by X's saying "Y's product is made of inferior steel." Or disparagement may be carried out in a comparative sense, as, by X's saying "Y's product will not relieve your headache but ours will." The law relating to puffing interfaces where there is comparative disparagement, because it is necessary to appraise whether the defendant's statements describing its product and comparing it with plaintiff's have exceeded the limits of permissible sales talk or hyperbole. In most circumstances inquiry into the allowable scope of a defendant's boasting will concern two existing products. But permitting an allowable range of sales talk is not limited as a matter of law to situations in which the product about which defendant's statements are made is at that moment in existence. The focus of trade disparagement is not on whether defendant's product exists, or will exist next week, or will exist next year, but on whether the statements defendant has made in drawing a comparison with plaintiff's product go beyond permissible limits. Statements about the fact of prospective availability, the expected date of availability, and the expected qualities of the product when available, are statements to be considered by a fact-finder, like any other statements about defendant's product (actual or prospective), in determining whether defendant has exceeded permissible limits in attempting to divert sales from plaintiff's product to defendant's product (actual or prospective). In this case the proper inquiry for the jury to determine was whether Greenlee departed from the allowable limits of sales talk by saying that it would *soon* market a *better* cable bender at a *lower* price. The district court refused to give defendant's requested instructions on this issue. This court's affirmance thrusts it into the determination of an issue peculiarly suited for jury determination— the acceptability of boasting sales talk.

Possibly, as a matter of law, it would have been beyond permissible limits of puffery if Greenlee had represented that *it had a product* better and cheaper than MCR's when in fact the product was merely being

developed and Greenlee only expected to have it later. But Greenlee made no such statement. Or, perhaps if Greenlee had not been engaged in the manufacture of goods in the same product line and had no practicable means to enter the line, an instruction on puffery would not have been required. Or, perhaps, if Greenlee were engaged in the same line but had done nothing toward development of the product represented to be soon available, no instruction would have been required. But these were not the circumstances. Greenlee was engaged in the same line and was seeking to develop a less expensive cable bender.

The majority's approach of treating boasting as amenable to decision as a matter of law will inhibit the processes for marketing new products and improving the old. Must manufacturers and their advertising agents, promoting the virtues of "NEW Product X" against existing "Product Y," be certain that no puffery is uttered before "NEW Product X" is in its final form of development and possibly in production? If not, how far along in the process of development must the product be, and how short the time span before its expected availability, before the manufacturer is past the reach of a judge's evisceral reaction that the manufacturer is boasting prematurely?

Assume defendant says "our new product will be better than plaintiff's, it will be cheaper, and it will be available in three months." Defendant is sued. It turns out that defendant's product became "existent" and in fact was better and cheaper, but it became available in six months rather than three. Or, the product becomes available within the time estimated but is not better, or not cheaper. Is the manufacturer, as a matter of law, outside the range of puffery because of over-optimistic statements of availability, of quality, or of cost? The majority's approach is ill adapted to an economy where research and development bring the consumer better products and are essential to a manufacturer's survival.

It is obvious that expectability of existence of a product and its time of availabili-

ty can be so remote that there is no jury issue. But this is not true here where Greenlee was engaged in manufacture of goods in the same product line and its engineering department was working on development of a less expensive cable bender. Moreover, remoteness in stage of development and in time was not the basis of the trial court's refusing the instructions on puffery. It perceived that there was a bright line rule that puffery was inapplicable to a product not then in existence.

The plaintiff makes an alternative argument, not referred to by the majority, that instructions on puffery were covered by the last paragraph of the instruction above quoted concerning when a statement of something that is to occur in the future can be considered a misrepresentation of fact. This part of the instruction does not adequately convey the concept of allowable sales talk or hyperbole.

### B. Unjustified interference with business relations

The basis for this claim is that statements by Greenlee prompted distributors and manufacturers' representatives to sever their connections with MRC or potential representatives to not make a connection. There was evidence that one or two sales representatives severed their connection and that one lost interest in making a connection by reason of Greenlee's statements. But there was no proof of any causal relationship between these occurrences and any damage to MRC. Damage cannot be inferred from the fact of the occurrences. There was no proof that MRC suffered a shortage of sales representatives or that it suffered any losses from the unavailability of the one or two who severed their connections and the one who did not make a connection.

### C. New trial on damages only

In the first trial the issues were submitted to the jury on special interrogatories under which the jury found that the defendant engaged in "unfair competition" that proximately resulted in damages to MRC. It found the amount of damages consisting of lost profits arising from loss in

value in the plaintiff's business. The court ordered a remittitur with the alternative of a new trial on the issue of damages only. The remittitur was refused.

The jury had found in the first trial that the defendant had engaged in "unfair competition." There had been no findings of whether this consisted of disparagement or of unjustified interference with business relations, or of both. At the second trial, on damages only, the court instructed the jury that it should decide "whether the false and misleading statements made by the Defendant regarding the availability, pricing and capabilities of its Model 800 cable bender were a proximate cause of any damage to MRC, and, if so, the extent of those damages." The two theories, trade disparagement and unjustified interference with business relations, focus on markedly different kinds of competitive harm. The effect of disparagement is to decrease the number of buyers of the product. The effect of business interference is a drop in sales representatives. Counsel for Greenlee pointed out that, in order to argue to the jury concerning damages, he needed to argue whether trade disparagement or interference with business relations, either or both, had been found by the first jury to exist. The court refused to permit this and held that the first trial had established that defendant had committed *both* types of unfair competition, and that defendant could only argue proximate cause of damages. Arguably, defendant should have objected at the first trial to the form of the interrogatory. But it is equally arguable that if the plaintiff wished to prove damages arising from both theories of unfair competition it had to object to a global interrogatory that did not establish the existence of both. We need not answer this argument, because, under the circumstances, it was unfair to the defendant to have a second trial on damages only.